ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON (150796)
A. RICK ATWOOD, JR. (156529)
DAVID T. WISSBROECKER (243867)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
randyb@rgrdlaw.com
ricka@rgrdlaw.com
dwissbroecker@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL HUSSEY, Individually and on Behalf of All Others Similarly Situated, )<br>)<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>RUCKUS WIRELESS, INC., BROCADE )<br>COMMUNICATIONS SYSTEMS, INC., )<br>STALLION MERGER SUB INC., SELINA Y. )<br>LO, SEAMUS HENNESSY, GEORGES )<br>ANTOUN, BARTON BURSTEIN, GAURAV )<br>GARG, STEWART GRIERSON, MOHAN )<br>GYANI, RICHARD LYNCH and MORGAN )<br>STANLEY & CO. LLC, )<br>)<br>Defendants. )<br>_____ ) | Case No. 3:16-cv-02991-EMC<br><br>CLASS ACTION<br><br>LEAD PLAINTIFF'S SECOND AMENDED COMPLAINT FOR VIOLATIONS OF §§14 AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND FOR BREACH OF FIDUCIARY DUTIES<br><br>DEMAND FOR JURY TRIAL |

1248436_1

1    Lead Plaintiff City of Pontiac General Employees' Retirement System ("Lead Plaintiff") and

2    Miguel Hussey (collectively, "Plaintiffs") individually and on behalf of all others similarly situated,

3    by the undersigned counsel, allege the following based upon information and belief, except for

4    Plaintiffs' own acts, which are alleged on knowledge, and upon a continuing investigation conducted

5    by and through Plaintiffs' counsel and retained expert consultant into the facts and circumstances

6    alleged herein, which included, without limitation, review and analyses of: (i) the public filings of

7    Ruckus Wireless, Inc. ("Ruckus" or the "Company") and Brocade Communications Systems, Inc.

8    ("Brocade") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases, public

9    statements, analyst reports, news articles, and other publications disseminated by or concerning

10   Ruckus, Brocade, their respective related entities, and the Acquisition (as defined below); and

11   (iii) the corporate websites of Ruckus and Brocade.

12                              **SUMMARY OF THE ACTION**

13       1.       This stockholder class action arises out of the 2016 acquisition ("Acquisition") of

14   Ruckus, a technology company that provides wireless connectivity solutions, by Brocade and its

15   subsidiary, Stallion Merger Sub Inc. ("Merger Sub").

16       2.       On April 4, 2016, Ruckus and Brocade announced that they had entered into an

17   Agreement and Plan of Merger (the "Merger Agreement"), under which Brocade, through Merger

18   Sub, would acquire all of the outstanding shares of Ruckus common stock for per share

19   consideration consisting of $6.45 in cash and 0.75 shares of Brocade common stock through a tender

20   offer and subsequent short-form merger.  Brocade commenced the tender offer on April 29, 2016,

21   and it expired on May 27, 2016.  Brocade completed the Acquisition later that same day.

22       3.       In connection with the tender offer, the Board caused Ruckus to file a Schedule

23   14D-9 Solicitation/Recommendation Statement (the "14D-9") with the SEC.  The 14D-9 included a

24   recommendation from the Board that Ruckus stockholders tender their shares.  However, in violation

25   of §14(e) of the Securities Exchange Act of 1934 (the "Exchange Act") and of the Board's fiduciary

26   duties under state law, the 14D-9 purposefully misrepresented and omitted material information.

27

28

1     4.    ***First***, the 14D-9 misrepresented material information regarding the financial analyses

2 performed by Morgan Stanley & Co. LLC ("Morgan Stanley"), which acted as Ruckus' financial

3 advisor and rendered a paid-for "fairness opinion" on the $14.43 per share Acquisition consideration.

4     5.    Morgan Stanley performed two versions of a discounted cash flow ("DCF") analysis,

5 which uses projected future financial information to arrive at a present value and is well recognized

6 as the foremost valuation analysis.   Using Ruckus management's base case scenario for the

7 Company's future performance (the "Base Case"), Morgan Stanley's DCF for a standalone Ruckus

8 (the "Standalone DCF") yielded implied valuation ranges of $14.57 per share to $21.10 per share.[1]

9 Even the very bottom end of the range exceeded what the Board agreed to, thus demonstrating the

10 financial unfairness of the Acquisition.

11     6.    Given the results of the Standalone DCF, the Defendants turned to deception so that

12 Morgan Stanley could deliver the "fairness opinion" that the Board needed to tout to stockholders.

13 Specifically, Morgan Stanley cobbled together a second, unorthodox DCF analysis designed to

14 obfuscate the difference in values between a standalone Ruckus versus what Ruckus stockholders

15 stood to receive from the Acquisition (the "Consideration DCF").   Morgan Stanley's Consideration

16 DCF using base case scenarios yielded implied valuation ranges of $17.61 per share to $22.35 per

17 share.

18     7.    Presented in the 14D-9 immediately below the Standalone DCF, Morgan Stanley's

19 DCF purported to show that the Acquisition offered Ruckus stockholders greater value than if the

20 Company remained a standalone enterprise.   This was materially misleading, however, as the 14D-9

21 concealed the fact that the Consideration DCF rested on hidden, fatally flawed assumptions.

22 Specifically, concealed in the Consideration DCF was the undisclosed fact that Morgan Stanley

23 assumed a value for Brocade ranging from $14.88 to $21.20 per share, a remarkably false

24 assumption since Brocade had not traded anywhere near that value in recent years, and Brocade

25

26 [1]    Morgan Stanley also performed a DCF analysis for Ruckus on a standalone basis using a
pessimistic set of financial projections, which resulted in a valuation range of $11.51 to $16.17 per

27 share, and an analysis using an optimistic set of projections, which resulted in a range of $17.12 to
$25.43 per share.  Based on Ruckus' subsequent performance, which exceeded expectations, the

28 pessimistic set represented the least likely outcome for the Company.

1   would admit to shareholders only months later that its value did not exceed $12.75 per share, ***even***
2   ***after acquiring*** Ruckus.  Brocade further admitted that its stock was not worth anywhere close to
3   $14.88 to $21.20 per share by reinvigorating its stock repurchase program to account for the stock
4   issued in the Acquisition, pursuant to which Brocade purchased more than 70 million shares at an
5   average price of $9.08 per share.  Lastly, a comparison of what Morgan Stanley did here versus what
6   Brocade's financial advisor did a few months later when Brocade agreed to be acquired by
7   Broadcom Corporation ("Broadcom" and the "Broadcom Deal") demonstrates that Morgan Stanley
8   employed dubious methods to force fit its fairness opinion to the unfair Acquisition price.

9        8.    Relying on the Board's recommendation that rested in large part on the materially
10   misleading Consideration DCF, shareholders tendered their shares to Brocade for far less than they
11   were worth, as demonstrated by the fact that just months later (in connection with the Broadcom
12   Deal), Brocade valued Ruckus at between $1.5 billion and $1.9 billion (net of cash) as compared to
13   $1.2 billion (net of cash) in the Acquisition.

14        9.    ***Second***, Defendants concealed Morgan Stanley's potential conflicts.  Specifically, the
15   14D-9 affirmatively stated that Morgan Stanley had not performed any work for Brocade during the
16   previous two years, and the 14D-9 vaguely provided that Morgan Stanley "may" have an equity,
17   debt, or other interest in "[Brocade], [Ruckus], or any other company, or any currency or
18   commodity, that may be involved in the Offer and the [Acquisition], or any related derivative
19   instrument."  This generic presentation obscured the fact that Morgan Stanley –while it was advising
20   the Board and performing financial analyses – held many millions of dollars' worth of Brocade
21   equity and debt securities.  This posed a clear conflict of interest that should have been disclosed.
22   As a result of this omission, the 14D-9 misled stockholders into believing that Morgan Stanley was
23   capable of acting as a fair and impartial financial advisor when, in fact, it had strong financial
24   reasons to favor Brocade.

25        10.   By peddling financial analyses that overstated the merits of the Acquisition and by
26   concealing Morgan Stanley's potential conflicts of interest, Defendants misled Ruckus stockholders
27   into tendering their shares and accepting the Acquisition.  The Company's stockholders were
28   damaged as a result of Defendants' misconduct because the materially misleading and inadequate

1   14D-9 caused stockholders to support a transaction that provided inadequate value for their common

2   stock.

3          11.   In addition to violating both federal and state disclosure laws, Defendants also

4   breached their fiduciary duties by sanctioning a flawed process that was designed to and did ensure

5   the sale of Ruckus to Brocade on terms preferential to Defendants while subverting the interests of

6   Plaintiffs and all other members of the class (defined herein).  The Acquisition was driven by the

7   Company's Board and management, who collectively held 8.5% of Ruckus' outstanding shares and

8   sought liquidity for their illiquid holdings in Ruckus stock.  When the Acquisition closed, while

9   Ruckus stockholders received a majority of consideration in the form of Brocade stock, the Board

10   and Company management received *$50 million in cash* from the sale of their shares to Brocade.

11          12.   The Company's senior management also secured *$19.5 million* more in change-of-

12   control payments.  All told, from the Acquisition, the Board and Company management took home

13   *$70 million* in cash alone which created a conflict of interest with the rest of the shareholders, who

14   were forced to accept a mix of cash and Brocade stock, which was not worth close to what

15   defendants claimed it was.

16          13.   Moreover, the Board allowed Ruckus' then President and Chief Executive Officer

17   Selina Y. Lo ("Lo") and Seamus Hennessy ("Hennessy") to negotiate offer letters with Brocade that

18   provided them with continued employment at Brocade following the closing of the Acquisition.  The

19   offer letters also gave Lo and Hennessy additional special benefits in the form of immediate vesting

20   and acceleration of 50% of their restricted and performance stock units and acceleration of vesting of

21   the other 50%, all of which was to be paid to defendants Lo and Hennessy *in cash*.

22          14.   Not surprisingly, defendant Lo entered into a tender and support agreement (the

23   "Support Agreement") with the Brocade Defendants, under which Lo agreed to tender all of her

24   shares in support of the Acquisition.  The rest of the Individual Defendants similarly agreed to

25   support the Acquisition.

26          15.   Meanwhile, despite unmistakable evidence of the volatility of the price of Brocade's

27   common stock, the Board failed to negotiate for a collar that would have protected Ruckus

28   stockholders against the subsequent attrition of Brocade stock.  Despite being valued at $14.43 per

1    share when it was first announced, the Acquisition was worth only $12.90 per share when it closed

2    due to the sharp drop in Brocade's stock price.

3       16.    The Board also hired a conflicted financial advisor.  As noted above and detailed

4    herein, Morgan Stanley stood to earned an $18.7 million fee that was **_wholly contingent_** on the

5    closing of the Acquisition, and it also owned substantial equity and debt interests in Brocade.

6       17.    After agreeing to accept Brocade's inadequate $14.43 per share, the Board members

7    exacerbated their breaches by agreeing to lock-up the Acquisition with a series of anticompetitive

8    "deal protection" measures.  Specifically, the Board agreed to: (i) a "no-solicitation" provision;

9    (ii) an illusory "fiduciary out" provision; (iii) an "information rights" provision; (iv) a "matching

10    rights" provision; and (v) a $50 million "termination fee" provision.  These measures, combined

11    with Lo's Support Agreement and the rest of the Individual Defendants' tacit agreement to tender

12    their shares, served only to preclude alternative bids for Ruckus and make the Acquisition a _fait_

13    _accompli_.

14       18.    As a result of Defendants' misconduct, Plaintiffs and all other Class members have

15    been harmed.

16                           **JURISDICTION AND VENUE**

17       19.    Plaintiffs' claims arise under §14(e) of the Exchange Act and Rule 14d-10

18    promulgated thereunder.  This Court has jurisdiction pursuant to 28 U.S.C. §1331 and §27 of the

19    Exchange Act, 15 U.S.C. §78aa.  Defendants used the U.S. mails and the instrumentalities of

20    interstate commerce.  The Court also has jurisdiction over this action pursuant to 15 U.S.C.

21    §78bb(f)(3)(A)(i), because it is a class action based on the statutory or common law of Delaware,

22    defendant Ruckus' state of incorporation, and thus may be maintained in federal court.  This Court

23    has supplemental jurisdiction under 28 U.S.C. §1367.

24       20.    Venue is proper here pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, because

25    Ruckus is headquartered in this District and certain of the transactions, acts, practices, and courses of

26    conduct constituting the violations alleged herein occurred within this District.

27

28

**PARTIES**

21.     Lead Plaintiff was, at all relevant times, a stockholder of Ruckus, as set forth in the certification attached to its motion to be appointed as lead plaintiff in this action, which this court granted on September 14, 2016.

22.     Plaintiff Miguel Hussey was at all times relevant a stockholder of Ruckus, as set forth in the certification attached to his initial complaint.

23.     Defendant Ruckus is a Delaware corporation, headquartered in Sunnyvale, California. As of when the Acquisition was announced, Ruckus provided wireless connectivity solutions for more than 65,300 enterprise, service provider, government, and small business customers worldwide.

24.     Defendant Brocade is a Delaware corporation headquartered in San Jose, California. Brocade holds itself out as a leading supplier of networking hardware, software and services, including Storage Area Networking solutions and Internet Protocol Networking solutions for businesses and organizations of various types and sizes.  Brocade's end customers include global enterprises and other organizations, which use the Company's products and services as part of their communications infrastructure, and service providers, such as telecommunication firms, cable operators and mobile carriers, which use the Company's products and services as part of their commercial operations.

25.     Defendant Merger Sub is a Delaware corporation and a wholly owned subsidiary of Brocade.  Merger Sub was formed for the sole purpose of completing the Acquisition.

26.     Defendant Lo was at all relevant times has been President, Chief Executive Officer, and a director of the Company.  Concurrently with the execution of the Merger Agreement, Lo entered into the Support Agreement with the Brocade Defendants, under which, among other things and subject to the terms and conditions set forth therein, Lo agreed to tender all Shares beneficially owned by her into the tender offer.  Based on the $14.43 per share Acquisition price, Lo stood to receive $78,120,777 for her shares of Ruckus common stock, as well as additional money from equity awards.  Lo also entered into an agreement with Brocade, whereby Lo would continue to lead Ruckus following the consummation of the Acquisition.

27.     Defendant Hennessy was at all relevant times Chief Financial Officer of the Company.  Based on the $14.43 per share Acquisition price, Hennessy stood to receive consideration worth approximately $7,289,417 for his shares of Ruckus common stock, as well as additional money from equity awards.  Hennessy also entered into an agreement with Brocade, whereby Hennessy would continue to serve as chief financial officer of Ruckus following the consummation of the Acquisition.

28.     Defendant Georges Antoun ("Antoun") was at all relevant times had been a member of the Board.   Based on the $14.43 per share Acquisition price, Antoun stood to receive consideration worth approximately $7,289,417 for his shares of Ruckus common stock.

29.     Defendant Barton Burstein ("Burstein")  was at all relevant times has been a member of the Board.   Based on the $14.43 per share Acquisition price, Burstein stood to receive consideration worth approximately $491,602 for his shares of Ruckus common stock.

30.     Defendant Gaurav Garg ("Garg") was at all relevant times a member of the Board.  Based on the $14.43 per share Acquisition price, Garg stood to receive consideration worth approximately $7,322,141 for his shares of Ruckus common stock.

31.     Defendant Stewart Grierson ("Grierson") was at all relevant times a member of the Board.  Based on the $14.43 per share Acquisition price, Grierson stood to receive consideration worth approximately $1,111,434 for his shares of Ruckus common stock.

32.     Defendant Mohan Gyani ("Gyani") was at all relevant times a member of the Board.  Based on the $14.43 per share Acquisition price, Gyani stood to receive consideration worth approximately $3,841,855 for his shares of Ruckus common stock.

33.     Defendant Richard Lynch ("Lynch") is, and at all relevant times has been, a member of the Board.  Based on the $14.43 per share Acquisition price, Lynch stood to receive consideration worth approximately $1,530,605 for his shares of Ruckus common stock.

34.     Defendant Morgan Stanley is a Delaware limited liability company that, according to its public filings, provides a wide variety of products and services to a large and diversified group of clients and customers, including corporations, government entities, and financial institutions.  Its businesses include securities underwriting and distribution; financial advisory services, including

1  advice on mergers and acquisitions, restructurings, real estate and project finance; sales, trading,

2  financing and market-making activities in equity and related products, and fixed income products

3  securities and related products; and sales, trading, financing and market-making activities in other

4  instruments including foreign exchange and commodities futures activities.  Morgan Stanley is a

5  wholly owned subsidiary of Morgan Stanley Domestic Holdings, Inc. ("MSDHI"), which, in turn, is

6  a wholly owned subsidiary of Morgan Stanley Capital Management, LLC, which, in turn, is a wholly

7  owned subsidiary of the parent Morgan Stanley.  In connection with the Acquisition, Morgan

8  Stanley, stood to earn $19.7 million for its services, approximately $18.7 million of which was

9  contingent upon the closing of the Merger and $1 million of which was paid following the execution

10  of the Merger Agreement.

11       35.  Defendants named in ¶¶26-33 are collectively referred to as the "Individual

12  Defendants."  Brocade and Merger Sub are collectively referred to as the "Brocade Defendants."

13  Ruckus, the Individual Defendants, the Brocade Defendants, and Morgan Stanley are collectively

14  referred to as "Defendants."

## CLASS ACTION ALLEGATIONS

16       36.  Plaintiffs bring this action individually and as a class action pursuant to Federal Rule

17  of Civil Procedure 23 on behalf of all former public holders of Ruckus common stock, excluding

18  Defendants and their affiliates (the "Class").

19       37.  This action is properly maintainable as a class action under Federal Rule of Civil

20  Procedure 23.

21       38.  The Class is so numerous that joinder of all members is impracticable.

22       39.  There are questions of law and fact which are common to the Class, including:

23          (a)  Whether the 14D-9 contained any material misrepresentations or omitted any

24  material information needed to make the 14D-9 not misleading;

25          (b)  Whether, as a result of the materially false, misleading, or inadequate 14D-9,

26  Ruckus and the Individual Defendants violated §14(e) of the Exchange Act, 15 U.S.C. §78n(a);

27          (c)  Whether, as a result of the materially false, misleading, or inadequate 14D-9,

28  Morgan Stanley violated §14(e) of the Exchange Act, 15 U.S.C. §78n(a);

1    (d)    Whether the Individual Defendants are liable as control persons under §20(a)

2 of the Exchange Act, 15 U.S.C. §78t(a);

3    (e)    Whether the Brocade Defendants are liable as control persons under §20(a) of

4 the Exchange Act, 15 U.S.C. §78t(a);

5    (f)    Whether the Individual Defendants breached their fiduciary duties owed to

6 Ruckus' stockholders;

7    (g)    Whether any of Defendants aided and abetted any of the foregoing violations

8 of the Exchange Act or the Board's fiduciary duty breaches; and

9    (h)    Whether the Class has suffered damage and is entitled to any relief as a result

10 of Defendants' violations of the federal securities laws.

11    40.    Plaintiffs' claims are typical of the claims of the other members of the Class, and

12 Plaintiffs are not subject to any atypical defenses.

13    41.    Plaintiffs are adequate representatives of the Class, have no interests adverse to the

14 Class, are committed to fairly and adequately protecting the interests of the Class, and have retained

15 competent counsel experienced in litigation of this nature.

16    42.    This action is maintainable under Rule 23(b)(1) and (3) of the Federal Rules of Civil

17 Procedure.  The prosecution of separate actions by individual members of the Class would create the

18 risk of inconsistent or varying adjudications that would establish incompatible standards of conduct

19 for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of

20 individual members of the Class who are not parties to the adjudications or would substantially

21 impair or impede absent Class members' ability to protect their interests.  Moreover, questions of

22 law or fact common to class members predominate over any questions affecting only individual

23 members, and a class action is superior to other available methods for fairly and efficiently

24 adjudicating the controversy.

25                    **SUBSTANTIVE ALLEGATIONS**

26 **Company Information Regarding Ruckus**

27    43.    As of when the Acquisition was announced, Ruckus was a global supplier of

28 advanced Wi-Fi solutions.  The Company's solutions, called "Smart Wi-Fi," were used by service

1  providers and enterprises to solve a range of network capacity, coverage, and reliability challenges

2  associated with increasing wireless traffic demands created by the growth in the number of users

3  equipped with more powerful smart wireless devices using increasingly data rich applications and

4  services.  The Smart Wi-Fi solutions offered features and functionality such as enhanced reliability,

5  consistent performance, extended range, and massive scalability.

6      44.    Ruckus' products included high capacity controllers, indoor and outdoor access

7  points, wireless bridges, controller software platforms, software management solutions including

8  reporting and analytics and unique Wi-Fi-related cloud services, such as location-based positioning,

9  and certificate-based security and on-boarding of Wi-Fi devices.  These hardware and software

10  products and services incorporated various elements of the Company's proprietary technologies,

11  including Smart Radio, SmartCast, SmartMesh, and Smart Scaling, to enable high performance in a

12  variety of challenging operating environments.

13      45.    Ruckus marketed and sold its products and technology directly and indirectly through

14  a vast network of channel partners to a variety of service providers and enterprises around the world.

15      46.    As demonstrated by the Company's own statements shortly before it entered into the

16  Merger Agreement, Ruckus was highly successful and expected that success to continue growing

17  well into the future.

18      47.    On February 9, 2015, Ruckus announced its financial results for its fourth quarter and

19  fiscal year ended December 31, 2015.  Among other things, the Company reported:

20      (a)    Revenue for the fourth quarter of 2015 was $100.1 million, an increase of

21  16.6% from the fourth quarter of 2014.  Specifically, Americas revenue grew 17.3%, EMEA revenue

22  grew 25.4% and APAC revenue grew 5.9% as compared to the fourth quarter of 2014;

23      (b)    GAAP operating income was $3.5 million for the fourth quarter of 2015,

24  compared with GAAP operating income of $3.2 million for the fourth quarter of 2014;

25      (c)    Non-GAAP net income was $13.4 million for the fourth quarter of 2015,

26  compared with non-GAAP net income of $11.5 million for the fourth quarter of 2014;

27      (d)    Non-GAAP operating income was $14.1 million for the fourth quarter of

28  2015, compared with non-GAAP operating income of $11.8 million for the fourth quarter of 2014;

1          (e)     Revenue for 2015 was $373.4 million, an increase of 14.2% from 2014; and

2          (f)     For the second year in a row, Ruckus was named a "Leader" in the IDC

3    MarketScape: Worldwide Enterprise WLAN 2015-2016 Vendor Assessment.  Ruckus was the only

4    pure-play wireless vendor in the leaders category.  IDC MarketScape credited Ruckus for "best-in-

5    class RF innovation" and cited "portfolio enhancements to expand both upmarket and downmarket"

6    in its assessment.

7         48.    Defendant Lo commented in connection with the release:

8          Our fourth quarter revenue was impacted by a multi-million dollar E-rate
     opportunity that was postponed late in the quarter.  Nevertheless, we achieved non-
9    GAAP operating margin at the high-end of guidance, demonstrating strong operating
     execution . . . .  ***I believe our strategy remains sound and our product portfolio***
10   ***differentiated, keeping Ruckus in a position to outgrow the market again in 2016***.
     We are equally focused on driving bottom-line growth in 2016, and we are
11   committed to grow earnings faster than revenue, driving operating margin expansion
     throughout the year.

12        49.    Also on February 9, 2016, the Company held a conference call with analysts and

13   other members of the investment community.  During the call, Lo touted the Company's growth and

14   outlined its plan for future growth:

15

16         In 2015, we grew revenue by 14%, in line with our guidance for low-to-mid
     teens annual growth.  As you may recall, 2015 got off to a slow start due to E-rate.
17   ***Nevertheless, we believe we outgrew the market for the eighth year in the row in***
     ***2015.  Through the first three quarters of 2015, we outgrew the market by nearly***
     ***3x based on Dell'Oro's Q3 Wireless LAN Market Report***.

18

19         ***Our goal is to grow revenue faster than the market again in 2016***.  We are
     equally focused on driving bottom line growth and expect to grow earnings faster
20   than revenue this year.  To accelerate our top line in 2016, we have three strategic
     priorities.  First, driving 802.11ac upgrades.  Momentum for offers to market
21   ZoneFlex R710 Wave 2 AP continues.  It alone accounted for 11% of our AP
     revenue in Q4.

22         We also just introduced the new ZoneFlex R310, our low-priced entry-level -
     our lowest price entry-level 11ac access points.  Probably less than one-third of our
23   ac installed base is 11ac.  ***With these products, we see an opportunity to accelerate***
     ***11ac upgrades among our customers***.  Furthermore, you see us aggressively build
24   out our ways to ac portfolio throughout 2016.

25                   *       *       *

26   So we have been, actually over the last few quarters, hiring more and more sales
     managers with direct touch and larger enterprise experience, and it has been our plan
27   to touch higher enterprises, higher education and larger enterprises.  As part of it is
     that ***we are seeing those opportunities opening up to us***, because we have been
28   evolving our products from just Wi-Fi infrastructure to now high-value solutions

with our NFV controllers as well as SPoT and SCI and Cloudpath.  And so we know that ***there are lots of opportunities for us there and we decided this year to focus some of our sales force specifically to provide high touch support in those accounts, and at the same time in our channel organization, we have been optimizing that organization, leveraging channel programs and leveraging other resources we have, so that we can continue to grow our core business***, especially since now we have very, very SMB-targeted products such as Unleashed as well as the R310.

50.     Despite Ruckus' improving metrics and strong prospects, the Board was concurrently pursuing a sale of the Company on terms that benefited the Individual Defendants but was unfavorable to Plaintiffs and the rest of the Class members.

**Brocade's Offers and Ruckus' Counter-Offers**
**Leading to the Acquisition**

51.     The process that resulted in the Acquisition arose out of the longstanding relationship between Ruckus and Brocade, including between and among their executives.

52.     In March 2015, a year before the Acquisition was agreed to, defendant Lo met with Brocade executives to discuss various partnership opportunities for Ruckus and Brocade.  Notably, Lo had known Brocade Chief Executive Officer Lloyd Carney ("Carney") for over 20 years, having worked together at least as far back as 1995.  Although Lo and Carney did not reach any definitive agreement in March 2015, they agreed to continue discussions in furtherance of a potential deal.

53.     On April 28, 2015, Lo and Carney met again, and Carney agreed to a non-exclusive commercial relationship between Brocade and the Company regarding "open systems" for wired and wireless networking using products from both companies.  While no formal arrangement was entered into at that time, Ruckus and Brocade began engaging in joint bids for certain contracts, and on August 28, 2015 the parties entered into an agreement to formalize its engagement in joint marketing and selling opportunities.

54.     Discussions regarding the Acquisition arose out these preexisting business discussions when, on August 5, 2015, Carney contacted Lo regarding a potential strategic transaction between the two companies.

55.     Over the next few months, Carney and Lo engaged in numerous discussions, and Ruckus permitted Brocade to conduct due diligence to enable Brocade to make an offer to buy the Company.

56.     During the process leading to the Acquisition, Ruckus received from Brocade a number of proposals to acquire all of the outstanding Ruckus shares.  Ruckus also made a number of counter-offers, as detailed below.  Early in the process, the Board rejected a Brocade offer valued at $13.00 per share as not "robust" enough to engage in discussions with Brocade.  Ultimately, however, and due to the Board's unexplained failure to insist upon a collar on the stock portion of the Acquisition consideration, the Board agreed to sell the Company to Brocade for consideration that was valued at just $12.90 per share when the Acquisition closed.

57.     On January 27, 2016, Brocade offered to acquire each outstanding Ruckus share for $6.00 in cash and 0.75 shares of Brocade stock (valued at the time of the offer at $12.00 per Ruckus share).  In reviewing the January 27, 2016 offer, the Board conjectured, without any justifiable basis, that the stock component was more valuable than the cash because Brocade was undervalued.  The Board rejected the January 27, 2016 offer, and Brocade refused to counter.

58.     On February 6, 2016, Ruckus management, including defendants Lo and Hennessy, met with representatives of Brocade.  Representatives of Morgan Stanley and Evercore Group L.L.C. ("Evercore"), Brocade's financial advisor, were also present.  At this meeting, Brocade's executives provided to and discussed with defendants Lo, Hennessy, and Morgan Stanley information regarding its business, historical financial performance, go-to-market strategy, product roadmap, and projections for Brocade's business.

59.     The Board met on February 10, 2016 to discuss the February 6, 2016 meeting between Ruckus and Brocade.  Representatives of Morgan Stanley and Company senior management also discussed with the Board the financial information, including Brocade's projections, as well as certain other information regarding the Company and Brocade.  In connection with this discussion, Ruckus, the Individual Defendants, and Morgan Stanley were provided with and also reviewed Brocade's financial projections.

60.     The Board met again on February 12, 2016 to discuss, among other things, Brocade's long-term value.

61.     By February 12, 2016, the value of the January 27, 2016 offer was below $12.00 per Ruckus share.

1    62.    By February 18, 2016, the value of the January 27, 2016 offer was up to $13.00 per

2    Ruckus share.  But the Board did not feel the January 27, 2016 offer, at $13.00 per share, was

3    "sufficiently robust" to engage in discussions with Brocade about a potential transaction.

4    63.    On February 21, 2016, Ruckus issued a counter-offer to Brocade to sell the Company

5    for $8.00 in cash and 0.75 shares of Brocade stock (valued at the time of the counter-offer at $15.19

6    per Ruckus share).

7    64.    On February 26, 2016, Brocade offered to acquire Ruckus for $6.25 in cash and 0.75

8    shares of Brocade stock (valued at the time of the offer at $13.19 per Ruckus share, $2 below

9    Ruckus' February 21, 2016 counter-offer).  Also on February 26, 2016, Evercore told Morgan

10    Stanley (which conveyed to the Board later that same day) that Brocade anticipated increasing its

11    existing share repurchase program in order to repurchase over a near term post-Acquisition horizon a

12    number of shares of Brocade common stock up to the number that would be issued in connection

13    with the Acquisition.

14    65.    Three days later, on February 29, 2016, the Board authorized a counter-offer to

15    Brocade of $7.00 in cash and 0.75 shares of Brocade stock (valued at the time the Board authorized

16    the counter-offer at $14.45 per Ruckus share).  Ruckus made this counter-offer to Brocade on March

17    4, 2016 (valued at the time the counter-offer was made at $14.68 per Ruckus share).  On March 9,

18    2016, Brocade gave Ruckus its best and final offer (which the Board accepted that day) of $6.45 in

19    cash and 0.75 shares of Brocade common stock (valued at the time of the offer at $14.06 per Ruckus

20    share).  As of the Acquisition closing, however, the value of the Acquisition consideration was just

21    $12.90 per Ruckus share.

22    66.    Despite clear evidence that the Board knew the market price of Brocade stock was

23    highly volatile from January through March 2016, the Board failed to insist on a collar that would

24    have protected the value Ruckus stockholders would receive in the Acquisition given the volatility of

25    Brocade's share price.

26    67.    The Board's failure to insist on a collar resulted in Ruckus stockholders receiving less

27    value ($12.90 per Ruckus share) than the offer that the Board in mid-February 2016 had thought was

28

1  not robustly sufficient enough for them to engage in discussions ($13.00 per Ruckus share) with

2  Brocade.

3  **Overview of the Acquisition**

4       68.     On April 4, 2016, Ruckus and Brocade announced that they had entered into the

5  Merger Agreement, under which Brocade would acquire all of the outstanding shares of Ruckus

6  common stock for $6.45 in cash and 0.75 shares of Brocade common stock per Ruckus share

7  through a tender offer and subsequent short-form merger pursuant to §251(h) of the Delaware

8  General Corporate Law.

9       69.     Merger Sub launched the tender on April 29, 2016, and it expired on May 27, 2016,

10  and the Acquisition was completed shortly thereafter.  Ruckus is now a wholly owned subsidiary of

11  Brocade.

12       70.     Only 58.3% of Ruckus shares were tendered into the tender offer.  Based on the fact

13  that Ruckus insiders held 8.5% of the Company's outstanding shares, fewer than a majority of

14  independent stockholders supported the Acquisition.

15       71.     Morgan Stanley acted as Ruckus' financial advisor in connection with the

16  Acquisition.  Evercore acted as Brocade's financial advisor.

17  **Brocade's Subsequent Share**
18  **Repurchase and Sale to Broadcom**

19       72.     On May 27, 2016, Brocade announced in a press release that it had completed the

20  Acquisition.  In that same release, Brocade stated that it had entered into a credit agreement with

21  several lenders, which collectively provided Brocade with a term loan facility of $800 million.

22  Brocade specifically stated: "The proceeds of both the term loan facility and the revolving credit

23  facility may also be used to finance the repurchase of Brocade shares following the consummation of

24  the exchange offer and the merger."

25       73.     Two months later, Brocade filed its Form 10-Q for the quarterly period ended July 30,

26  2016.  As revealed in the 10-Q, for the three months ended July 30, 2016, Brocade repurchased

27  approximately 72.7 million shares for a total of $660.7 million, or an average of $9.08 per share.

28  According to Brocade's Form 10-Q for the quarterly period ended July 30, 2016, these repurchases

1  were "primarily due to [Brocade's] efforts to repurchase shares equivalent to the number of shares

2  issued as stock consideration in connection with the completion of the Ruckus acquisition." In short,

3  almost immediately following the Acquisition, Brocade admitted that what Morgan Stanley said was

4  worth $14.88 to $21.20 per share was, in fact, worth only $9.08 per share.

5       74.    On November 2, 2016, barely five months after completing the Acquisition of

6  Ruckus, Brocade announced that it had entered into a merger agreement with Broadcom, under

7  which Broadcom would acquire Brocade for $12.75 per share in cash, or a total of approximately

8  $5.5 billion (the "Broadcom Deal"). Evercore continued to serve as Brocade's financial advisor,

9  which included performing financial analyses regarding the Broadcom Deal.

10 **Defendants Sanctioned the Filing of a**
   **Materially Misleading and Inadequate 14D-9**

11

12       75.    To secure stockholder support for the Acquisition, Defendants disseminated to

13 shareholders materially misleading and inadequate 14D-9, thus violating §14(e) of the Exchange Act

14 and also the Board's fiduciary duty of complete and accurate disclosure. As detailed below, the

15 14D-9 contained a materially misleading discussion of Morgan Stanley's financial analyses

16 supporting the Acquisition, and the 14D-9 also omitted material information regarding Morgan

17 Stanley's potential conflicts of interest.

   **The 14D-9's Misleading Disclosure of**
18 **Morgan Stanley's Financial Analyses**

19       76.    The 14D-9 contained representations from Ruckus, the Board, and Morgan Stanley

20 that Morgan Stanley's financial analyses supported the fairness of the Acquisition price, and

21 numerous other representations purportedly bolstering this position. However, the 14D-9

22 misrepresented and omitted material information regarding Morgan Stanley's financial analyses,

23 including its Consideration DCF. As explained below, the 14D-9 omitted that Morgan's Stanley's

24 Consideration DCF implied a value of Brocade's stock of $14.88 to $21.20 per share. This omission

25 was material, because it assumed a value for Brocade's stock that was far in excess of its actual

26 intrinsic value and led to the Consideration DCF grossly overstating the value of the Acquisition to

27 Ruckus stockholders.

28

LEAD PLAINTIFF'S SECOND AMENDED COMPLAINT - 3:16-cv-02991-EMC

1   77.   The 14D-9 statement on pages 29 and 30 that the Board recommended that Ruckus

2   stockholders tender their shares into the tender offer based on, among other things:

3   (a)   "the belief of the Board that the Offer and the [Acquisition] are more

4   favorable to the Company's stockholders than the potential value that might result from the other

5   alternatives reasonably available to the Company, including the alternative of remaining a standalone

6   public company and other strategies that might be pursued as a standalone public company,

7   including a share repurchase program or pursuing a strategic acquisition"; and

8   (b)   "the oral opinion, subsequently confirmed in writing, that as of April 3, 2016,

9   and based upon and subject to the assumptions made, procedures followed, matters considered and

10   qualifications and limitations upon the scope of the review undertaken by Morgan Stanley as set

11   forth in the written opinion, the Offer Consideration to be received by the holders of Shares (other

12   than Excluded Shares) pursuant to the Merger Agreement was fair, from a financial point of view, to

13   such holders."

14   78.   The 14D-9 further provided on page 42:

15   Morgan Stanley's opinion and its presentation to the Board was one of many
16   factors taken into consideration by the Board in deciding to approve and adopt the
    Merger Agreement, declare the advisability of the Merger Agreement and approve
17   the Transactions, including the Offer and the Merger.

18   79.   The 14D-9 further stated on page 32 that Morgan Stanley rendered a paid-for opinion

19   that the consideration offered in Acquisition was fair, as follows:

20   In connection with the Offer and the Merger, at the meeting of the Board on
    April 3, 2016, [Morgan Stanley], the Company's financial advisor, rendered to the
    Board its oral opinion, subsequently confirmed in writing, that as of April 3, 2016 . . .
21   *the Offer Consideration to be received by the holders of Shares (other than
    Excluded Shares) pursuant the Merger Agreement was fair from a financial point
22   of view to such holders*.

23   80.   Morgan Stanley's purported fairness opinion was also appended to the 14D-9 and

24   stated, among other things, that "the Consideration to be received by the holders of shares of the

25   Company Common Stock (other than Excluded Shares) pursuant to the Merger Agreement is fair

26   from a financial point of view to such holders of shares of the Company Common Stock."

27   81.   These representations are false, misleading, and inadequate, however, as they rested

28   upon fatally flawed and misleading assumptions in Morgan Stanley's financial analyses.  As detailed

below, Morgan Stanley's Consideration DCF assumed a value for Brocade that was both objectively and subjectively false, as revealed through subsequent events. Indeed, this false assumption – that Brocade was worth between $14.88 and $21.20 per share – was (i) concealed from Ruckus stockholders, and (ii) inherently false and misleading.

82.     Morgan Stanley performed two separate DCF analyses – the Standalone DCF and the Consideration DCF – in each case using three different iterations of financial projections: a mid-range "Base Case," a slower growth "Downside Case," and a faster growth "Upside Case."[2]

83.     Morgan Stanley's Standalone DCF using Ruckus' Base Case projections yielded a value range of $14.57 to $21.10 per share. Even the low end of this analysis exceeded the $14.43 per share Acquisition price, and the midpoint of $17.84 per share far exceeded the Acquisition price.

84.     As specifically set forth in the 14D-9:

Based on the outstanding Shares on a fully-diluted basis (including outstanding options, restricted stock awards and restricted stock units) as of April 1, 2016 (the last full trading day prior to the meeting of the Board to approve and adopt the Merger Agreement), Morgan Stanley calculated the estimated implied value per Share as of April 1, 2016 as follows:

|  | Terminal Value Perpetual Growth Rate | Implied Value Per Share ($) |
|---|---|---|
| Company Slower Small Cell Forecasts | 1.0% – 3.0% | 11.51 – 16.17 |
| Company Management Case Forecasts | 1.0% – 3.0% | 14.57 – 21.10 |
| Company Faster Small Cell Forecasts | 1.0% – 3.0% | 17.12 – 25.43 |

85.     Thus, Morgan Stanley's Standalone DCF demonstrated that the Acquisition was unfair. This left Defendants, who wanted to complete the Acquisition and earn disparate compensation from that received by other Ruckus stockholders, and Morgan Stanley, who wanted

---

[2]     Ruckus' financial projections are summarized on page 43 of the 14D-9, and Brocade's financial projections are summarized on page 45 of the 14D-9. Because the Base Case represents Ruckus' management's best estimate regarding future performance, Plaintiffs focus on that set for the purpose of this pleading. Indeed, post-Acquisition statements made by Brocade reveal that Ruckus' subsequent short-term exceeded expectations, which lends support for operating under an even more optimistic set of financial projections. Moreover, in connection with the Broadcom Deal, Evercore used a set of projections substantially similar to the Ruckus Base Case projections to value Ruckus as part of Evercore's "sum of the parts" analysis, lending further credibility to the Base Case set of projections.

1    nearly $20 million in fees, forced to devise a scheme for tricking Ruckus stockholders into

2    supporting the Acquisition.

3        86.    The solution was a contrived analysis – the Consideration DCF.  Morgan Stanley

4    purportedly performed the Consideration DCF to value the consideration being offered in

5    Acquisition, which was unnecessary because the parties' press release announcing the deal already

6    stated that the Acquisition was worth $14.43 per share.

7        87.    Presented in the 14D-9 immediately below the Standalone DCF, Morgan Stanley's

8    Combination DCF purported to show that the Acquisition offered Ruckus stockholders greater value

9    than if the Company remained a standalone enterprise.  In particular, Morgan Stanley attempted to

10   "value" the Acquisition by adding: (i) the $6.45 per share cash consideration Ruckus stockholders

11   would receive; (ii) the results of a standalone DCF analysis it performed for Brocade (which was

12   never separately disclosed); and (iii) a DCF analysis based on the supposed synergies contrived by

13   Morgan Stanley that would supposedly flow from the Acquisition.

14       88.    As set forth in the 14D-9:

15       Morgan Stanley then compared these per Share values with the discounted
         cash flow value per Share value of the Offer Consideration as of April 1, 2016 that
16       each shareholder of the Company would receive in the Offer and the Merger in
         exchange for a Share.  The value that would be received for each Share was defined
17       as the discounted cash flow value per share of the [Brocade] Common Stock, after
         giving effect to the Merger and incorporating the value of certain synergy forecasts
18       (the "Synergies," which are described below under "*Certain Financial Forecasts –
         Estimated Synergies*"), multiplied by the 0.75 transaction exchange ratio, plus $6.45
19       of cash consideration per Share.

20       Morgan Stanley utilized estimates from the [Brocade] Forecasts (consisting
         of the [Brocade] Low Range Forecasts, the [Brocade] Mid Range Forecasts and the
21       [Brocade] High Range Forecasts, each as defined below) and the Synergies for
         purposes of its discounted cash flow analysis of the combined [Brocade] and
22       Company discounted cash flow analysis.  The [Brocade] Forecasts and the Synergies
         are more fully described below in this Item 4 under the heading "*Certain Financial
23       Forecasts*."  Morgan Stanley's calculation of [Brocade] free cash flow used the same
         methodology as described for the Company's free cash flow above.  The [Brocade]
24       Forecasts through 2018 were based on projections prepared by [Brocade] for fiscal
         years 2016 and 2017 and a financial model prepared by [Brocade] for fiscal year
25       2018 (as described below under the heading, "*Certain Financial Forecasts –
         Financial Forecasts for [Brocade]*"), and the estimates for calendar years 2019
26       through 2025 represented an extrapolation of 2018 estimates.  Morgan Stanley
         calculated the net present value of free cash flows for [Brocade] for the years 2016
27       through 2025 and calculated terminal values in the year 2025.  The free cash flows
         and terminal values were discounted to present values as of April 1, 2016 (the last
28       full trading day prior to the meeting of the Board to approve and adopt the Merger

Agreement) at rates of 6.7%, 7.5%, and 8.4% and at perpetual growth rates ranging from -1.0% – 2.0% depending on the particular [Brocade] Forecast case. The discount rates and perpetual growth rates were selected, upon the application of Morgan Stanley's professional judgment and experience, to reflect [Brocade]'s weighted average cost of capital and estimates long-term growth rate.

Morgan Stanley calculated the implied value of the Offer Consideration received per Share as follows:

| | Implied Value Per Share ($) |
|---|---|
| Company Slower Small Cell Forecasts/ [Brocade] Low Range Forecasts | 15.95 – 19.56 |
| Company Management Case Forecasts / [Brocade] Mid Range Forecasts | 17.61 – 22.35 |
| Company Faster Small Cell Forecasts / [Brocade] High Range Forecasts | 19.17 – 25.18 |

89. This was materially misleading, however, as the 14D-9 concealed the fact that the Consideration DCF rested on hidden, fatally flawed assumptions. Specifically, concealed in the Consideration DCF was Morgan Stanley's undisclosed and unsupportable premise that Brocade was worth $14.88 to $21.20 per share, which, as explained below, was a remarkably false assumption.

90. Several factors demonstrate that the $14.88 per share to $21.20 per share range for Brocade was utterly unsupportable, including:

(a)     Brocade subsequently continued a stock repurchase program that valued Brocade stock at far less than Morgan Stanley's assumed valuation. Specifically, for the three months ended July 30, 2016, Brocade repurchased approximately 72.7 million shares for a total of $660.7 million, or an average of $9.08 per share. According to Brocade's Form 10-Q for the quarterly period ended July 30, 2016, these repurchases were "primarily due to [Brocade's] efforts to repurchase shares equivalent to the number of shares issued as stock consideration in connection with the completion of the Ruckus acquisition." In short, what Morgan Stanley said was worth $14.88 to $21.20 per share, Brocade almost immediately thereafter admitted was worth only $9.08 per share.

(b)     Broadcom agreed to acquire Brocade for only $12.75 per share just months after the Acquisition was completed. In agreeing to this deal, Brocade admitted that its value did not exceed $12.75 per share, *even after acquiring Ruckus*.

1          (c)     Brocade stock, which would be by far the largest component of the new

2 company, had not traded above $15.00 per share since 2002.

3          (d)     Analyst price targets for Brocade topped out at $14.00 per share.

4       91.     Given that the assumptions underlying Morgan Stanley's Consideration DCF were

5 baseless, the results of Morgan Stanley's Consideration DCF were demonstrably false and inherently

6 misleading insofar as it purported to convey that Brocade was, in fact, worth between $14.88 per

7 share and $21.20 per share.

8       92.     In summary, because of the material omission of the implied value of Brocade's stock

9 from the Consideration DCF, the 14D-9 was materially misleading because it falsely touted Morgan

10 Stanley's financial analyses as supporting: (i) Morgan Stanley's opinion that the Acquisition

11 consideration offered by Brocade was fair; (ii) the Board's conclusion, which was based on Morgan

12 Stanley's work, that the Acquisition consideration was fair; and (iii) the Board's recommendation for

13 Ruckus stockholders to tender their shares.

14 **Subjective Falsity**

15       93.     Defendants knew that the above-described representations were false and misleading.

16       94.     Ruckus, the Individual Defendants, Morgan Stanley, and the Brocade Defendants all

17 had access to information concerning the trading history of Brocade's stock price – Brocade's stock

18 price was public knowledge, and the 14D-9 expressly states on page 29 that, in recommending that

19 stockholders tender their shares in connection with the Acquisition, the Board considered "the

20 historical share prices of the Company and [Brocade]."

21       95.     The 14D-9 also states that Ruckus, the Individual Defendants, and Morgan Stanley

22 were all given and discussed Brocade's financial projections throughout the process culminating in

23 the Acquisition, as follows:

24          (a)     From page 19: "On February 6, 2016, in light of [Brocade]'s request that the

25 Company provide [Brocade] with a counter-offer, members of Company management, including

26 Ms. Lo, Mr. Hennessy, Ian Whiting, Chief Commercial Officer of the Company, and Mr. Burstein,

27 met with members of [Brocade] management, including Mr. Carney, Mr. Fairfax, Jack Rondoni,

28 Vice President of Storage Networking of [Brocade], Mr. Nolet, Rob Eggers, Vice President of

1    Finance, Mr. Herrell, Mr. Rado and Mr. Cheng, to better understand the business and prospects of

2    [Brocade]. At this meeting, [Brocade] presented the Company with information regarding its

3    business, historical financial performance, go-to-market strategy, product roadmap and the [Brocade]

4    projections for the [Brocade] Low Range Forecasts and [Brocade] High Range Forecasts as

5    described in Item 4 below under the heading '*Certain Financial Forecasts – Financial Forecasts for*

6    *[Brocade]*.' . . .  Representatives of Morgan Stanley and representatives of Evercore also attended

7    the meeting."

8                (b)    From page 19: "On February 10, 2016, the Board held a special meeting at

9    which members of Company senior management and representatives of Sullivan & Cromwell and

10   Morgan Stanley were in attendance. . . .  Representatives of Morgan Stanley and Company senior

11   management also discussed with the Board the financial information, including the [Brocade]

12   projections discussed at the February 6 meeting with the Company's management, as well as certain

13   other information regarding the Company and [Brocade]."

14               (c)    From page 28, while not explicit, the 14D-9 makes clear that the Board

15   reviewed Brocade's projections at a meeting held on April 3, 2016, when the Board voted to approve

16   the Merger Agreement.  Specifically, the Board received a presentation from Morgan Stanley, which

17   included the foregoing financial analyses and also took into account Brocade's financial projections

18   – "Representatives of Morgan Stanley reviewed with the Board Morgan Stanley's financial analysis

19   of the transaction."

20         96.    The Board also stated that it relied on, among other things:

21               (a)    information and discussions with the Company's management and advisors

22   "regarding [Brocade]'s business, operations, financial condition, strategy and prospects";

23               (b)    "the fact that a portion of the transaction consideration is comprised of shares

24   of [Brocade] Common Stock, so that the Company's stockholders will have an ability to participate

25   in any future share price appreciation of the combined company and potential revenue and cost

26   synergies created by the transaction";

27               (c)    "the opportunity for the combined company to accelerate substantial cross-

28   selling through complementary vertical markets"; and

1    (d)    "information and discussions with Company management regarding

2  [Brocade]'s business, assets, results, current business strategy and prospects, and the belief of the

3  Board that [Brocade] would likely be able to execute on the Company's long term plan."

4    97.    In fact, on page 29 the 14D-9 expressly referenced "the historical share prices of the

5  Company and [Brocade]" as one of the factors supporting the Board's recommendation.  Moreover,

6  as alleged above, Defendants discussed Brocade's business, including its prospects, during numerous

7  due diligence sessions and subsequent Board meetings where such issues were discussed.  Further,

8  during the course of negotiations relating to the Acquisition, representatives of Brocade had

9  discussed its plans to increase its stock repurchase program.

10    98.    The 14D-9 also sets forth that Morgan Stanley considered Brocade's intrinsic value

11  and market price when constructing its fairness opinion, as follows:

12    In connection with rendering its opinion, Morgan Stanley, among other
   things:

13

14    •    reviewed certain publicly available financial statements and other
   business and financial information of the Company and [Brocade], respectively;

15    •    reviewed certain internal financial statements and other financial and
   operating data concerning the Company and [Brocade], respectively;

16

17    •    reviewed certain financial projections prepared by the managements
   of the Company and [Brocade], respectively;

18    •    reviewed information relating to certain strategic, financial and
   operational benefits anticipated from the Merger, prepared by the managements of
   the Company and [Brocade], respectively;

19

20    •    discussed the past and current operations and financial condition and
   the prospects of the Company, including information relating to certain strategic,
   financial and operational benefits anticipated from the Merger, with the Company's
   senior executives;

21

22

23    •    discussed the past and current operations and financial condition and
   the prospects of [Brocade], including information relating to certain strategic,
   financial and operational benefits anticipated from the Merger, with senior
   executives of [Brocade];

24

25    •    reviewed the pro forma impact of the Merger on [Brocade]'s earnings
   per share, cash flow, consolidated capitalization and financial ratios;

26

27    •    reviewed the reported prices and trading activity for the Shares and
   [Brocade] Common Stock;

28

- • compared the financial performance of the Company and [Brocade] and the prices and trading activity of the Shares and [Brocade] Common Stock with that of certain other publicly-traded companies comparable with the Company and [Brocade], respectively, and their securities;

                    *        *        *

- • performed such other analyses, reviewed such other information and considered such other factors as Morgan Stanley deemed appropriate.

99.     The 14D-9 also expressly stated on page 33 that Morgan Stanley "assumed and relied upon, without independent verification, the accuracy and completeness of the information that was publicly available or supplied or otherwise made available to Morgan Stanley by the Company and [Brocade], and formed a substantial basis for its opinion."

100.     Accordingly, Defendants knew that the foregoing representations were false and misleading when they caused the 14D-9 to be filed in support of the Acquisition.

101.     Moreover, although no standalone valuation of Brocade was ever disclosed in the 14D-9, a comparison of what Morgan Stanley did in connection with the Acquisition to what Evercore did in connection with the Broadcom Deal demonstrates that Morgan Stanley employed fraudulent tactics to make the Acquisition appear fair.  The financial projections for Brocade – used by Morgan Stanley as per the 14D-9 and used by Evercore as per the proxy filed for the Broadcom Deal – were substantially similar.

102.     Despite the similarity in projections used, Morgan Stanley and Evercore came up with dramatically different results for Brocade's value: Morgan Stanley at $14.88 to $21.20 per share in connection with the Consideration DCF and Evercore at $10.45 to $14.65.  The disparity in values for Brocade demonstrates that Morgan Stanley resorted to demonstrably unreasonable methods in attempting to create the illusion that Brocade was worth $14.88 to $21.20 per share and, as a result, that the Acquisition consideration was fair.  And given the Board retained Morgan Stanley based on its purported "qualifications, expertise and reputation, its knowledge of and involvement in recent transactions in the Company's industry, and its knowledge of the Company's business and affairs," that Morgan Stanley employed such specious methods demonstrates that it knew its implied valuation of Brocade in connection with the Consideration DCF was indefensible.

1     103.    In sum, based on the information available to them and the steps taken in connection

2 with the Acquisition, Ruckus, the Individual Defendants, and Morgan Stanley knew that the

3 Consideration DCF was overvalued.

4 **Objective Falsity**

5     104.    As alleged above, the assumption regarding Brocade's value in the Consideration

6 DCF was objectively false. Specifically, Morgan Stanley's representation that Brocade was worth

7 between $14.88 and $21.20 per share was objectively false because:

8         (a)    Brocade's post-Acquisition stock purchase program – which Ruckus, the

9 Individual Defendants, and Morgan Stanley were told about in advance – valued Brocade's stock at

10 just $9.08 per share;

11         (b)    Brocade stock had not traded above $15.00 per share since 2002;

12         (c)    Broadcom agreed to acquire Brocade for only $12.75 per share just months

13 after the Acquisition was completed; and

14         (d)    Analyst price targets for Brocade topped out at $14.00 per share.

15     105.    Relying on the Board's recommendation that rested in large part on the materially

16 misleading Consideration DCF, shareholders tendered their shares to Brocade for far less than they

17 were worth.

18 **The 14D-9 Omitted Material Information Regarding**
**Morgan Stanley's Potential Conflicts of Interest**

19

20     106.    The 14D-9 omitted material information concerning potential conflicts of interest

21 affecting Morgan Stanley necessary to make the 14D-9 not misleading. In particular, the 14D-9

22 concealed the fact that, while it was advising Ruckus and the Board, Morgan Stanley owned a

23 substantial interest in Brocade, thus potentially aligning its interests with the Brocade instead of its

24 adversary (*i.e.*, Ruckus) in negotiating the Acquisition.

25     107.    The 14D-9 should have disclosed that Morgan Stanley and its affiliates hold over 3.67

26 million shares of Brocade common stock and hold $9.762 million in Brocade notes. Morgan

27 Stanley's substantial financial interest in Brocade posed a potential conflict of interest, thus

28 permitting Morgan Stanley to improperly influence the sales process and also motivating Morgan

LEAD PLAINTIFF'S SECOND AMENDED COMPLAINT - 3:16-cv-02991-EMC       - 25 -

1    Stanley to skew its financial analyses (as discussed above) to prop up the ostensible merits of the

2    Acquisition.

3          108.    Instead of disclosing Morgan Stanley's potential conflict of interest, the 14D-9 only

4    stated in vague, conclusory fashion:

5               Morgan Stanley is a global financial services firm engaged in the securities,
       investment management and individual wealth management businesses.  Its securities
6       business is engaged in securities underwriting, trading and brokerage activities,
       foreign exchange, commodities and derivatives trading, prime brokerage, as well as
7       providing investment banking, financing and financial advisory services.  Morgan
       Stanley, its affiliates, directors and officers may at any time invest on a principal
8       basis or manage funds that invest, hold long or short positions, finance positions, or
       may trade or otherwise structure and effect transactions, for their own account or the
9       accounts of their customers, in debt or equity securities or loans of [Brocade], the
       Company, or any other company, or any currency or commodity, that may be
10      involved in the Offer and the Merger, or any related derivative instrument.

11              Under the terms of its engagement letter, Morgan Stanley provided the
       Company and the Board with financial advisory services and the Board with a
12      financial opinion, described in this section and attached to this Schedule 14D-9 as
       Annex A, in connection with the Offer and the Merger, and the Company has agreed
13      to pay Morgan Stanley a fee of approximately $19.7 million for its services (which
       represents 1.3% of the transaction value as of the closing of the Merger with the
14      transaction value determined by reference to the fully diluted Shares of the Company
       as of the closing of the Merger and a 10 day average of the closing price of the
15      [Brocade] Common Stock prior to the announcement of the proposed Merger),
       approximately $18.7 million of which is contingent upon the closing of the Merger
16      and $1 million of which has already been paid following the execution of the Merger
       Agreement.  The Company has also agreed to reimburse Morgan Stanley for certain
17      of its expenses, including fees of outside counsel and other professional advisors,
       incurred in connection with its engagement.  In addition, the Company has agreed to
18      indemnify Morgan Stanley and its affiliates, its and their respective directors,
       officers, agents and employees and each other person, if any, controlling Morgan
19      Stanley or any of its affiliates against certain liabilities and expenses relating to,
       arising out of or in connection with Morgan Stanley's engagement.

20              In the two years prior to the date of its opinion, Morgan Stanley has not
21      provided financial advisory services or financing services to the Company or
       [Brocade].  Morgan Stanley may seek to provide financial advisory and financing
22      services to [Brocade] and the Company and their respective affiliates in the future
       and would expect to receive fees for the rendering of these services.

23         109.    These statements were designed to give Ruckus stockholders the impression that

24    Morgan Stanley had no conflicts of interest, other than what it stood to receive in connection with

25    the Acquisition.

26         110.    These statements are misleading, however, because they failed to disclose Morgan

27    Stanley's aforementioned financial interest in Brocade.

28

111.     Indeed, although the 14D-9 disclosed the Board's Ad Hoc Committee determined to hire Morgan Stanley to serve as its financial advisor, and that Morgan Stanley or its affiliates may hold debt or equity securities of Ruckus or Brocade, nowhere does the 14D-9 disclose that Morgan Stanley continuously held Brocade debt and equity securities.  Nor does the 14D-9 disclose if or how the Board considered this conflict, and if so, why the Board chose to hire Morgan Stanley as its one and only financial advisor.

112.     Without this information, stockholders could not reasonably consider whether the Board's advisor was conflicted in giving its fairness opinion.  Indeed, adequate disclosure would have led Ruckus stockholders to more closely scrutinize the financial analyses that Morgan Stanley performed in support of its paid-for fairness opinion.

113.     Defendants were aware of the requirement under the federal securities laws to disclose the foregoing material information in the 14D-9 and acted with that knowledge in failing to ensure that this material information was disclosed in the 14D-9.  The Board, moreover, had absolute control over the factors they proffered to Ruckus stockholders as substantiating their recommendation of the Acquisition.  Defendants, moreover, had control over the contents and filing of the 14D-9, as Ruckus, the Individual Defendants, and the Brocade Defendants all had the authority to comment on and make edits to the 14D-9 before its filing.

114.     Absent disclosure of this material information, stockholders were unable to make an informed decision about whether to tender their shares or seek appraisal.  Indeed, Defendants all had a substantial personal financial interest in the Acquisition and were determined to mislead Ruckus' stockholders – even if less than a majority of public stockholders succumbed – into tendering their shares and accepting the Acquisition.

**Defendants Acted with the Requisite State of Mind**

115.     Ruckus, the Individual Defendants, and Morgan Stanley perpetrated the filing of the materially false, misleading, and inadequate 14D-9 as part of their plan to deceive and manipulate Ruckus stockholders into approving the Acquisition.

116.     As alleged herein, the Individual Defendants stood to earn substantial consideration that differed markedly from the consideration that Plaintiffs and the Class stood to receive.  Indeed,

while Ruckus' public stockholders received Acquisition consideration predominantly consisting of volatile Brocade stock, the Individual Defendants ensured that they would receive cash, which totaled roughly $70 million.  Moreover, defendants Lo and Hennessy had secured lucrative post-close arrangements with Brocade.

117.  As also alleged, Morgan Stanley had a substantial financial interest in Brocade due to its ownership of Brocade debt and equity securities, and Morgan Stanley also stood to earn roughly $18.7 million in fees that were entirely contingent upon completion of the Acquisition.

118.  The Individual Defendants also had the means and access to the information required to mislead stockholders regarding the Acquisition.  In particular, Morgan Stanley knew that it would be performing financial analyses in support of an eventual fairness opinion – its engagement letter provided for a fee solely for signing the Merger Agreement, and it provided financial guidance to the Board throughout the process leading up to the Acquisition.  Morgan Stanley's work – performing financial analyses and rendering a fairness opinion – was an essential part of the Board's decision to vote to enter into the Merger Agreement.  Moreover, the dissemination of Morgan Stanley's financial analyses and fairness opinion in the 14D-9 was a key component to soliciting Ruckus stockholder support for the Acquisition.  Further, as alleged herein, approval of the Acquisition was essential to Morgan Stanley receiving $18.7 million in fees.

119.  Accordingly, Ruckus, the Individual Defendants, and Morgan Stanley all had the motive and opportunity to deceive Ruckus stockholders into approving the Acquisition.  And by sanctioning the filing of a 14D-9 that contained material misrepresentations and omissions that misled stockholders into approving the Acquisition, Ruckus, the Individual Defendants, and Morgan Stanley, in fact, did deceive and manipulate Ruckus stockholders.

**The Board Sanctioned a Flawed Process That Was Plagued by Extensive Conflicts of Interest**

120.  The Acquisition is the product of a hopelessly flawed process that was designed to and did ensure the sale of Ruckus to Brocade on terms preferential to defendants and other Ruckus insiders, while subverting the interests of Plaintiffs and the other public stockholders of the Company.

121.    From the outset, the Acquisition appears to have resulted from something less than arm's-length negotiations.  Specifically, as alleged above, negotiations between Ruckus and Brocade emerged from the fact that the two companies and their respective CEOs had longstanding relationships and were already discussing potential partnership and joint venture opportunities.  The process that followed demonstrates that Brocade was always the preferred buyer in violation of the Board's fiduciary duties

122.    The Acquisition also was driven by self-interest and disloyalty of the Company's current Board and management, who prior to the close of the Acquisition, collectively held 8.5% of Ruckus' outstanding shares (over 7.6 million shares).  The Board and other Company insiders sought liquidity for their illiquid holdings in Ruckus stock, and the Acquisition offered significant liquidity to the Board and management for their illiquid Ruckus shares.  When the Acquisition closed, the Board and Company management received almost $50 million in cash alone from the sale of shares owned as of the date of the Merger Agreement, as the following table shows:

| Name | Number of Shares | Cash Consideration for Shares | Number of Shares of [Brocade] Common Stock Received for Shares | Total Value of Shares |
|---|---|---|---|---|
| **Executive Officers (4)** | | | | |
| Selina Lo (5) | 5,719,991 | $ 36,893,942 | 4,289,991 | $ 78,120,777 |
| Seamus Hennessy | 533,730 | $ 3,442,559 | 400,296 | $ 7,289,417 |
| Dan Rabinovitsi | 41,919 | $ 270,378 | 31,438 | $ 572,509 |
| Ian Whiting | 46,004 | $ 296,726 | 34,502 | $ 628,300 |
| Scott Maples | 181,326 | $ 1,169,553 | 135,992 | $ 2,476,460 |
| **Directors (8)** | | | | |
| Georges Antoun | 99,987 | $ 644,916 | 74,998 | $ 1,365,572 |
| Barton M. Burstein | 35,995 | $ 232,168 | 26,995 | $ 491,602 |
| Gaurav Garg | 536,126 | $ 3,458,013 | 402,093 | $ 7,322,141 |
| Stewart Grierson | 81,379 | $ 524,895 | 61,032 | $ 1,111,434 |
| Mohan Gyani | 281,300 | $ 1,814,385 | 210,937 | $ 3,841,855 |
| Richard Lynch | 106,071 | $ 684,158 | 79,551 | $ 1,530,605 |

123.    Brocade promised and paid different and increased consideration to the Individual Defendants than all other Ruckus stockholders received.  From the Acquisition, Ruckus' officers and directors received millions of dollars in special payments – not made to ordinary stockholders – for

1    vested and unvested stock options, performance shares and restricted stock. Critically, while

2    Ruckus' stockholders were forced to take uncollared Brocade stock for about 50% of the per share

3    consideration they received for their Ruckus shares, members of the Board and Company

4    management received all cash for their vested stock options.

5           124.   Moreover, the Board allowed defendants Lo and Hennessy to negotiate offer letters

6    with Brocade that provided both with continued employment at Brocade following the closing of the

7    Acquisition. The offer letters also give defendants Lo and Hennessy additional special benefits in

8    the form of immediate and accelerated vesting of 50% of their restricted and performance stock units

9    and acceleration of vesting of the other 50%, all of which was to be paid to defendants Lo and

10   Hennessy in cash.

11          125.   The Company's senior management was also entitled to receive from the Acquisition

12   $19.5 million more in change-of-control payments. All told, from the Acquisition, the Board and

13   Company management stood to receive almost $70 million in cash alone. Thus, Board members

14   were conflicted and served their own financial interests rather than those of Ruckus' other

15   stockholders.

16          126.   The Board also hired a conflicted financial advisor, Morgan Stanley. The Board

17   agreed to pay, and paid, Morgan Stanley an $18.7 million fee that was wholly contingent on the

18   closing of the Acquisition. Moreover, according to a Form 13-F that Morgan Stanley filed with the

19   SEC on May 12, 2016, as of March 31, 2016, Morgan Stanley and its affiliates owned over 3.67

20   million shares of Brocade common stock and held $9.762 million in Brocade notes.

21          127.   Motivated by self-interest, the Board sanctioned a flawed process that was not

22   reasonably designed to maximize stockholder value.

23          128.   Although the Individual Defendants stood to receive substantial sums of cash, the

24   Board accepted Brocade's final offer to acquire Ruckus for the unfair price of just $6.45 in cash and

25   0.75 shares of Brocade common stock for each Ruckus share, without insisting upon a collar on the

26   stock portion of the Acquisition consideration. The Board acted unreasonably by failing to insist

27   upon a collar, because it was well-known that Brocade' stock had recently lost a lot of value and was

28   highly volatile.

129.    Even during the process, the Board saw the offer price fluctuate considerably due to the Brocade stock component.

130.    Thus, the conflicted and unfair process benefited only Brocade and the Board and Company management.   In approving such an unfair deal, the Board members violated their fiduciary duties by handing Ruckus to Brocade for an unfair price, while giving themselves different consideration than that received by the Company's public stockholders.

**The Acquisition Offered Inadequate Consideration**

131.    This flawed and conflicted sales process resulted in an unfair price for Ruckus' public stockholders.  The Acquisition consideration drastically undervalued the Company and its prospects.

132.    As alleged above, Ruckus' business has top-level growth, and Lo announced during its February 9, 2016 earnings call that the Company expected to lead the market in growth. Accordingly, Ruckus is a strong business with impressive prospects, and the Acquisition did not adequately compensate for the Company's potential.

133.    The Acquisition is also unfair because the Board's failure to insist upon a collar resulted in a final price that was far less than what the Board originally agreed to accept.  Based on the closing price of Brocade stock the day before the Acquisition was announced ($10.64), the Acquisition consideration was valued at just $14.43 per Ruckus share.  However, the market price of Brocade common stock subsequently collapsed, and on May 27, 2016, the day the tender offer expired, closed at $8.60 per share, reducing the value of the Acquisition consideration to a mere $12.90 per Ruckus share.

1    134.    The value of the Acquisition consideration Plaintiffs and all other members of the

2 Class received was also below Ruckus common stock's October 9, 2015 52-week trading high of

3 $13.50 per share, and it was well below at least one analyst's high price target of $15.00 per share.

4    135.    Morgan Stanley's Standalone DCF, which resulted in values ranging from $14.57 to

5 $21.10 per share, also demonstrated that the Acquisition was unfair.

6    136.    The Acquisition also offered inadequate consideration because the synergies touted to

7 Ruckus stockholders were eviscerated when Brocade agreed to be acquired by Broadcom.

8 Specifically, based on input from Ruckus and Brocade, Morgan Stanley calculated potential

9 synergies from the Acquisition as follows:

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Net Revenue Synergies | $— | $19.7 | $41.9 | $44.5 | $47.3 |
| Total Cost Synergies | $(40.0) | $9.6 | $20.2 | $21.2 | $22.6 |
| Pre-Tax Synergies | $(40.0) | $29.2 | $62.1 | $65.7 | $69.9 |
| Post-Tax Synergies | $(30.8) | $22.5 | $47.8 | $50.6 | $53.8 |

(*Amounts in millions*)

15    137.    Given these analyses, it is clear that nearly none of the positive synergies were

16 realized as a result of the Broadcom Deal.

17    138.    The Acquisition also undervalued Ruckus based upon the financial analyses touted to

18 Brocade stockholders in connection with the Broadcom Deal.  Although the equity value and

19 enterprise of the Acquisition was approximately $1.2 billion and $1.4 billion, respectively, the

20 analyses performed by Evercore regarding the Broadcom Deal implied an enterprise value for

21 Ruckus ranging from $1.5 billion to $1.9 billion, which far exceeds the aggregate consideration

22 agreed to by the Board.

23    139.    Indeed, the disclosures disseminated in connection with the Broadcom Deal show

24 that, while the value of Brocade was substantially less what was touted as of the Acquisition (*i.e.*,

25 through Morgan Stanley's Consideration DCF), the value of Ruckus was considerably more than

26 previously stated (*i.e.*, $1.5 billion to $1.9 billion, compared to the Acquisition value of $1.2 billion).

27    140.    Comments made by Brocade following the completion of the Acquisition also

28 demonstrate that the Acquisition undervalued Ruckus.  Specifically, Ruckus has contributed

1    substantially to Brocade's bottom line, and Ruckus' business has overperformed compared to initial

2    expectations.

3        141.    As explained by Brocade CEO Lloyd Carney during an earnings call held on August

4    20, 2016:

5           Turning to IP Networking, we exceeded our overall revenue outlook, largely
            due to the strong contribution from Ruckus Wireless, following the completion of
6           our acquisition on May 27.  We continued to see increasing demand for the Ruckus
            ZoneFlex access point, in line with the ongoing industry upgrade cycle to 802.11ac.
7           With less than one-third of access point installed base running this latest generation
            today, we believe this cycle and the growing demand for Wave 2 should continue to
8           provide a long-term growth opportunity.

9        142.    Elsewhere during the same call, Carney explained that Brocade's decision to expand

10   the Ruckus portfolio would help it continue Ruckus' ***track record of outpacing market growth***.

11       143.    The Acquisition price is also inadequate in light of the fact that on February 1, 2016,

12   Ruckus' Board instructed Morgan Stanley to inform private equity firms and any other all-cash

13   bidders that the Company would expect an offer price of "no less than $15.00 in cash per share."

14   **Preclusive Deal Protection Devices**

15       144.    To ensure Brocade, and only Brocade, acquired Ruckus, the members of the Board

16   further breached their fiduciary duties by including several deal protection devices in the Merger

17   Agreement.

18       145.    First, the deal protection devices in the Merger Agreement precluded a fair sales

19   process for the Company and locked out competing bidders, and included: (i) a no-shop clause that

20   precluded the Company from soliciting potential competing bidders; (ii) a matching rights provision

21   that required the Company to disclose confidential information about competing bids to Brocade and

22   allowed Brocade to match any competing proposal; and (iii) a termination and expense fee provision

23   that required the Company to pay Brocade $50 million if the Acquisition was terminated in favor of

24   a superior proposal.

25       146.    Second, in return for her offer letter from Brocade, concurrently with the execution of

26   the Merger Agreement, defendant Lo entered into the Tender and Support Agreement, pursuant to

27   which, among other things, and subject to the terms and conditions therein, defendant Lo agreed to

28   tender all shares beneficially owned by her into the Tender offer.  As Lo controlled over 6.3% of

1   Ruckus' outstanding shares, and the other members of the Board and management controlled an

2   additional 2.2%, defendants received tenders from Ruckus' public stockholders of less than 50% of

3   all shares, but were still able to force the close of the Acquisition without a stockholder vote.

4   **The Board Acted Disloyally and in Bad Faith by**
    **Concealing the Fraudulent Assumptions in**
5   **Morgan Stanley's Consideration DCF**

6       147.   The Individual Defendants were highly motivated to complete the Acquisition. The

7   Board also knew that Morgan Stanley's Consideration DCF, and subsequent fairness opinion, relied

8   upon unreasonable and misleading assumptions.

9       148.   Accordingly, the Board acted in bad faith and disloyally by proffering a misleading

10  fairness opinion to Ruckus stockholders in connection with the Individual Defendants' efforts to

11  secure approval for the Acquisition.

12      149.   In breach of their fiduciary duties, these provisions substantially and improperly

13  limited the Board members' ability to act with respect to investigating and pursuing superior

14  proposals and alternatives, including a sale of all or part of Ruckus.

15      150.   As a result of Defendants' conduct, Plaintiffs and all other members of the Class have

16  been harmed.

17                          **COUNT I**

18              **Violations of §14(e) of the Exchange Act**
                **(Against Ruckus and the Individual Defendants)**
19
        151.   Plaintiffs repeat and reallege each allegation as if fully set forth herein.
20
        152.   Section 14(e) of the Securities Exchange Act of 1934, provides:
21
            It shall be unlawful for any person to make any untrue statement of a material fact or
22          omit to state any material fact necessary in order to make the statements made, in the
            light of the circumstances under which they are made, not misleading, *or* to engage
23          in any fraudulent, deceptive, or manipulative acts or practices, in connection with
            any tender offer or request or invitation for tenders, or any solicitation of security
24          holders in opposition to or in favor of any such offer, request, or invitation.

25      153.   Ruckus and the Individual Defendants prepared, reviewed, and/or disseminated the

26  false and misleading 14D-9 which failed to disclose material facts necessary in order to make the

27  statements made, in light of the circumstances under which they were made, not misleading.

28

1    154.    As stated herein, the 14D-9 contained untrue statements of material facts and omitted

2    to state material facts necessary to make the statements that were made not misleading in violation of

3    §14(e) of the Exchange Act.  Ruckus and the Individual Defendants failed to correct the 14D-9 and

4    the failure to update and correct false statements.  The omissions and false and misleading

5    statements in the 14D-9 were material in that a reasonable stockholder would have considered them

6    important in deciding whether to tender their shares in support of the Acquisition.  In addition, a

7    reasonable investor would view a full and accurate disclosure as having significantly altered the

8    "total mix" of information made available in the 14D-9 and in other information reasonably

9    available to stockholders.

10    155.    The 14D-9 was an essential link in the consummation of the Acquisition.  As a direct

11    result of Defendants' preparation, review, and dissemination of the false and/or misleading 14D-9,

12    Plaintiffs and the class were induced to tender their shares and accept inadequate consideration in

13    connection with the Acquisition.  The false and/or misleading 14D-9 used to obtain stockholder

14    approval of the Acquisition deprived Plaintiffs and the class of their right to make a decision on the

15    tender offer based on adequate information.

16    156.    Ruckus and the Individual Defendants acted negligently and also with scienter.  At all

17    times relevant to the dissemination of the materially false and/or misleading 14D-9, defendants were

18    aware of and/or had access to the true facts concerning Ruckus' true value, which was far greater

19    than the value that share Ruckus' stockholders received.  Thus, as a direct and proximate result of

20    the dissemination of the false and/or misleading 14D-9 defendants used to obtain stockholder

21    approval of and thereby consummate the Acquisition, Plaintiffs and the class have suffered damage

22    and actual economic losses (*i.e.*, the difference between the price Ruckus stockholders received and

23    Ruckus' true value at the time of the Acquisition) in an amount to be determined at trial.

24    157.    By reason of the misconduct detailed herein, the defendants are liable pursuant to

25    §14(e) of the Exchange Act.

26

27

28

1

## COUNT II

2

### Violations of §14(e) of the Exchange Act
### (Against Morgan Stanley)

3

4

158.     Plaintiffs repeat and reallege each allegation as if fully set forth herein.

5

159.     Morgan Stanley assisted in the preparation and review of the false and misleading

6

14D-9, which failed to disclose material facts necessary in order to make the statements made, in

7

light of the circumstances under which they were made, not misleading.

8

160.     As stated herein, the 14D-9 contained untrue statements of material facts and omitted

9

to state material facts necessary to make the statements that were made not misleading in violation of

10

§14(e) of the Exchange Act.  Morgan Stanley failed to take any steps to correct the 14D-9 and the

11

failure to update and correct false statements.  The omissions and false and misleading statements in

12

the 14D-9 were material in that a reasonable stockholder would have considered them important in

13

deciding whether to tender their shares in support of the Acquisition.  In addition, a reasonable

14

investor would view a full and accurate disclosure as having significantly altered the "total mix" of

15

information made available in the 14D-9 and in other information reasonably available to

16

stockholders.

17

161.     The 14D-9 was an essential link in the consummation of the Acquisition.  Moreover,

18

the inclusion of Morgan Stanley's fairness opinion and financial analyses regarding the fairness of

19

the Acquisition were a key part in the 14D-9's solicitation of support for the Acquisition.  Indeed,

20

based on industry practice and Morgan Stanley's experience advising on mergers and acquisitions,

21

Morgan Stanley knew that its financial analyses would be presented to stockholders as substantiating

22

that the Acquisition was financially fair.  As a direct result of the false and/or misleading 14D-9,

23

Plaintiffs and the Class were induced to tender their shares and accept inadequate consideration in

24

connection with the Acquisition.  The false and/or misleading 14D-9 used to obtain stockholder

25

approval of the Acquisition deprived Plaintiffs and the Class of their right to make a decision on the

26

tender offer based on adequate information.

27

162.     Morgan Stanley acted negligently and also with scienter.  At all times relevant to the

28

dissemination of the materially false and/or misleading 14D-9, Morgan Stanley was aware of and/or

1   had access to the true facts concerning Ruckus' true value, which was far greater than the value that

2   share Ruckus' stockholders received.  Thus, as a direct and proximate result of the dissemination of

3   the false and/or misleading 14D-9 which was used to obtain stockholder approval of and thereby

4   consummate the Acquisition, Plaintiffs and the Class have suffered damage and actual economic

5   losses (*i.e.*, the difference between the price Ruckus stockholders received and Ruckus' true value at

6   the time of the Acquisition) in an amount to be determined at trial.

7        163.    By reason of the misconduct detailed herein, Morgan Stanley is liable pursuant to

8   §14(e) of the Exchange Act.

9                                   **COUNT III**

10                      **Violations of §20(a) of the Exchange Act**
                        **(Against the Individual Defendants)**

11

12       164.    Plaintiffs repeat and reallege each allegation set forth herein.

13       165.    The Individual Defendants acted as controlling persons of Ruckus within the meaning
    of §20(a) of the Exchange Act.

14

15       166.    By virtue of their positions as officers and/or directors and/or controlling stockholders

16   of Ruckus, and/or their participation in and/or awareness of the Company's operations and/or

17   intimate knowledge of the false statements contained in the 14D-9 filed with the SEC, the Individual

18   Defendants had the power to influence and control and did influence and control, directly or

19   indirectly, the decision-making of the Company, including the content and dissemination of the

20   various statements which Plaintiffs contend are false and misleading.

21       167.    Each of the Individual Defendants were provided with or had unlimited access to

22   copies of the 14D-9 and other statements alleged by Plaintiffs to be misleading prior to and/or

23   shortly after these statements were issued and had the ability to prevent the issuance of the

24   statements or cause the statements to be corrected.

25       168.    In particular, each of the Individual Defendants had direct and supervisory

26   involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

27   the power to control or influence the particular transactions giving rise to the securities violations as

28   alleged herein, and exercised the same.    The 14D-9 at issue contained the unanimous

recommendation of each of the members of the Board to approve the Acquisition.  Defendant Hennessy oversaw the preparation of, *inter alia*, the projections and other financial information concerning Ruckus that was included in the 14D-9.  The Individual Defendants were thus directly involved in the making of this document.

169.    By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## COUNT IV

### Violations of §20(a) of the Exchange Act
### (Against Brocade and Merger Sub)

170.    Plaintiffs repeat and reallege each allegation set forth herein.

171.    The Brocade Defendants are controlling persons of Ruckus and the Individual Defendants within the meaning of §20(a) of the Exchange Act.  By reason of its contractual obligations with Ruckus, the Individual Defendants, the Brocade Defendants possessed control over Ruckus and the Individual Defendants.

172.    Section 2.6 of the Merger Agreement provides for the participation of defendants Brocade and Merger Sub in the preparation, filing and distribution of the 14D-9: "Each of [Brocade] and Purchaser shall promptly furnish all information concerning [Brocade] and Purchaser and their Affiliates, respectively, as may be reasonably requested by the Company to be included in the Schedule 14D-9 so as to enable the Company to comply with its obligations under this Section 2.6. [Brocade], Purchaser and the Company shall cooperate in good faith to determine the information regarding [Brocade] and Purchaser that is necessary to include in the Schedule 14D-9 in order to satisfy applicable Laws."

173.    Ruckus and the Individual Defendants were required by the Merger Agreement to refrain from changing the operation of the Company's business or engaging in a variety of activities without the express written consent of Brocade.

174.    Pursuant to the Merger Agreement, Ruckus was not permitted to change the record date for the stockholder meeting on the Acquisition without the Buyer Defendants' prior written consent.

175.     Pursuant to the Merger Agreement, Ruckus had to prepare the 14D-9 "in consultation" with Brocade.  Moreover, the Company was obligated to give Brocade the opportunity to comment on the 14D-9, and Ruckus had to consider any comments made by Brocade concerning the 14D-9.  The Merger Agreement also required Ruckus to involve Brocade in any communications it might have with the SEC concerning the 14D-9.

176.     By reason of such conduct, the Brocade Defendants are liable pursuant to §20(a) of the Exchange Act.

## COUNT V

### Breach of Fiduciary Duty
### (Against the Individual Defendants)

177.     Plaintiffs repeat and reallege each allegation as if fully set forth herein.

178.     The members of the Board have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, candor and independence owed to the former public stockholders of Ruckus and have acted to put their personal interests and the interest of Brocade ahead of the interests of Ruckus' former stockholders.

179.     By the acts, transactions and courses of conduct alleged herein, the members of the Board, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith unfairly deprived Plaintiffs and all other members of the Class of the ability to make informed and intelligent decisions regarding their former investment in Ruckus.

180.     As demonstrated by the allegations above, the members of the Board knowingly or recklessly failed to exercise the care required, and breached their duties of loyalty, good faith and independence owed to the former stockholders of Ruckus because, among other reasons, they failed to provide all material information about the Acquisition to Ruckus' stockholders, and act in accordance with their fundamental duties of good faith, due care and loyalty.

181.     By reason of the foregoing acts, practices and course of conduct, the members of the Board violated their fiduciary obligations toward Plaintiffs and all other members of the Class.

182.     As a result of the unlawful actions of the members of the Board, Plaintiffs and all other members of the Class have been damaged.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT VI**

**Aiding and Abetting**
**(Against Brocade and Merger Sub)**

183.     Plaintiffs repeat and reallege each allegation as if fully set forth herein.

184.     Defendants Brocade and Merger Sub are sued herein as aiders and abettors of the breaches of fiduciary duties outlined above by the members of the Board of Ruckus.

185.     As alleged herein, the members of the Board breached their fiduciary duties of good faith, loyalty, and due care to Ruckus stockholders by failing to provide all material information about the Acquisition to Ruckus' stockholders, and act in accordance with their fundamental duties of good faith, due care, candor, and loyalty.

186.     Such breaches of fiduciary duties could not, and would not, have occurred but for the conduct of defendants Brocade and Merger Sub which, therefore, aided and abetted such breaches via entering into the Merger Agreement and the offer letters given to Lo and Hennessy.

187.     Defendants Brocade and Merger Sub had knowledge that they were aiding and abetting the members of the Board in the breaches of their fiduciary duties to the Ruckus stockholders.

188.     Defendants Brocade and Merger Sub rendered substantial assistance to the members of the Board in the breaches of their fiduciary duties to the Ruckus stockholders.

189.     As a result of the conduct of defendants Brocade and Merger Sub, aiding and abetting the members of the Board in the breaches of their fiduciary duties, Plaintiffs and all other members of the Class have been damaged.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand injunctive and monetary relief, in Plaintiffs' favor and in favor of the Class and against defendants, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

1          B.      Declaring that defendants violated the federal securities laws as alleged herein by

2   disseminating the 14D-9 in connection with the Acquisition, which contains materially false and

3   misleading information about the Acquisition;

4          C.      Rescinding the Acquisition, or, in the alternative, if rescission is not feasible,

5   awarding rescissory damages;

6          D.      Awarding Plaintiffs and the Class damages;

7          E.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable

8   attorneys' and experts' fees; and

9          F.      Granting such other and further equitable and monetary relief as this Court may deem

10  just and proper.

11                              **JURY DEMAND**

12         Plaintiffs demand a trial by jury.

13  DATED:  March 27, 2017                ROBBINS GELLER RUDMAN
                                            & DOWD LLP
14                                        RANDALL J. BARON
                                          A. RICK ATWOOD, JR.
15                                        DAVID T. WISSBROECKER

16

17                                              s/ David T. Wissbroecker
                                             DAVID T. WISSBROECKER
18
                                          655 West Broadway, Suite 1900
19                                        San Diego, CA  92101
                                          Telephone:  619/231-1058
20                                        619/231-7423 (fax)

21                                        Lead Counsel for Plaintiffs

22                                        SULLIVAN, WARD, ASHER & PATTON, P.C.
                                          CYNTHIA J. BILLINGS
23                                        1000 Maccabees Center
                                          25800 Northwestern Highway
24                                        Southfield, MI  48075-1000
                                          Telephone:  248/746-0700
25                                        248/746-2760 (fax)

26                                        Additional Counsel for Plaintiff

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

    I hereby certify that on March 27, 2017, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5

caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6

CM/ECF participants indicated on the attached Manual Notice List.

7

    I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on March 27, 2017.

9

                        s/ David T. Wissbroecker
                        DAVID T. WISSBROECKER

10

11

                        ROBBINS GELLER RUDMAN
                          & DOWD LLP

12

                        655 West Broadway, Suite 1900
                        San Diego, CA  92101-8498
                        Telephone:  619/231-1058

13

                        619/231-7423 (fax)

14

                        E-mail: dwissbroecker@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1248436_1

**Mailing Information for a Case 3:16-cv-02991-EMC Hussey v. Ruckus Wireless, Inc. et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kevin Michael Benedicto**
  kevin.benedicto@morganlewis.com

- **Joseph Edward Floren**
  jfloren@morganlewis.com,apurdy@morganlewis.com,rluke@morganlewis.com

- **Edward M. Gergosian**
  ed@gergosian.com,johanna@gergosian.com

- **William Scott Holleman**
  ScottH@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,scotth@johnsonandweaver.com,michaelf@johnsonandweaver.com,ceciliar@johnsonandweaver.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Marc J. Sonnenfeld**
  msonnenfeld@morganlewis.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **David Todd Wissbroecker**
  dwissbroecker@rgrdlaw.com,spatel@rgrdlaw.com,e_file_sd@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)